264

CITY OF GREENBRIER et al. *v.* Gene COTTON

87-72                                737 S.W.2d 444

Supreme Court of Arkansas
Opinion delivered October 12, 1987
[Rehearing denied November 16, 1987.*]

*David H. White*, for appellants.

*Sharon DuPriest*, for appellee.

DARRELL HICKMAN, Justice. This case involves a salary dispute between the deputy city marshal of Greenbrier and that city. The deputy, Gene Cotton, was appointed by the duly elected city marshal, Jerry Manley. Cotton was unable to convince the

---

*Purtle, J., would grant rehearing.

city council to pay him a salary. But he served anyway from January 2, 1985, through September 9, 1985, and sued the city for compensation. At the trial the city argued the case should not go to the jury because the city did not pass an ordinance for the salary. The case was submitted to the jury under an agency and implied contract theory and they awarded Cotton $3,800. The city appeals arguing that the trial judge was wrong to submit this to the jury. We agree.

The facts are largely undisputed. The city of Greenbrier is a city of the second class. Second class cities may have city marshals. See Ark. Stat. Ann. § 19-1103.2 (Repl. 1980). The city marshal can be elected or appointed by the mayor with approval of the city council. Ark. Stat. Ann. § 19-1103.2; *Kennedy* v. *Garner*, 230 Ark. 698, 326 S.W.2d 910 (1959). In this case the city marshal, Jerry Manley, was elected to that position. He had in the past used part time deputies: some worked as volunteers and one worked part time and was apparently paid $160 per month.

Manley appointed Gene Cotton as a deputy marshal and Cotton was sworn in on January 2, 1985. The marshal did not consult with the council about the appointment. The marshal testified that he told Cotton he would "try to get him" a salary of $850 per month and a uniform allowance of $100. Manley said he discussed with the council the need for a full time deputy at a city council meeting which was held shortly after the city officials were sworn in. Manley testified that Alderman Sutterfield asked him at this meeting if he needed a full time deputy, and he said yes. Sutterfield asked him how much he intended to pay Cotton, and he said $850 per month plus the $100 uniform allowance. He said Alderman Garrett told him to have Cotton get in uniform if he was going to work for the city and to quit using his (Cotton's) wrecker to pull vehicles within the city limits. Cotton owned and operated a wrecker service prior to being appointed as deputy. Cotton began work after he was sworn in.

Manley testified that one day he and Cotton were driving on the road by Alderman Johnny Henderson's house. They stopped and talked to him about the amount of the deputy's salary. Manley said Henderson agreed the salary sounded fair, and he didn't see where there would be any problems receiving it.

Manley testified he went to the next two or three council meetings and asked about the salary, and the city council would table it until the next meeting. Finally, the city council refused to talk about the salary and would not let Manley place it on the agenda.

Cotton testified he bought uniforms and leased his wrecker service. He talked to Alderman Henderson about a salary and mentioned $850 plus the $100 uniform allowance. He said Henderson thought that would be more than fair. Cotton testified he thought he was going to be paid after the first council meeting. He said he attended several council meetings thereafter when the salary question was raised. He testified he was told to get this and that, and it was not made clear to him that he was not going to be paid. When asked whether he was under the impression he would be paid even after the city council repeatedly refused to authorize a deputy's salary, Cotton responded, "maybe I was having delusion . . ." An alderman at one of the council meetings asked Cotton if he would be willing to accept $160, and Cotton responded with a question to the alderman, "could he live on a hundred sixty?" Cotton said he was under the impression, from talking to Manley, that the budget would allow a salary of $850.

Cotton essentially testified that the council never told him anything, but he continued to work full time until September 9, 1985, when he got other employment. He was never paid anything by the city. During this time Cotton said he often worked as many as 60 hours a week, used his own automobile and paid for the gas. He conceded that the city council did not tell him they would reimburse him for the gas.

It was stipulated there was no ordinance passed authorizing a salary for Cotton.

Alderman Garrett testified that he explained to Marshal Manley at the first city council meeting after Cotton was sworn in that there was not sufficient money in the budget for a full time deputy. Garrett also testified that he told Cotton there was insufficient money in the budget for a full time deputy.

The city clerk testified that Cotton wrote only one ticket in his name during the period of time in question. On all other tickets, Manley was the arresting officer of record with Cotton signing his name beside Manley's.

Cotton's legal argument, which was accepted by the trial judge, was that Manley, the marshal, was the agent of the city and Cotton was the subagent. The council, by its action or failure to act, ratified Cotton's employment and owed him compensation. Cotton concedes that the council has the authority to set the salary by ordinance; but at the same time, he argues the council could not remain silent, allowing him to work. He contends that the city should have at least passed an ordinance or resolution declaring Cotton was a volunteer and that it did not want his services.

The trial judge instructed the jury that "The sole issue for you to determine is whether there was an affirmative act or some negative act by the city council, which of itself would amount to an approval of the employment of the plaintiff, Gene Cotton."

At the close of the evidence, the city moved for a directed verdict. It should have been granted. The trial judge erred in submitting this case to the jury. Legal disputes involving salary disagreements are not uncommon between city marshals and city councils. *Horton* v. *City of Marshall*, 227 Ark. 141, 296 S.W.2d 418 (1956). If the city marshal is elected, he is an independent public official. An elected marshal cannot be fired by the mayor or city council. *See* Ark. Stat. Ann. § 19-1103. *See also City of Augusta* v. *Angela*, 225 Ark. 884, 286 S.W.2d 321 (1956). If a marshal is appointed by the mayor with the consent of the council, pursuant to Ark. Stat. Ann. § 19-1103.2, the marshal can be fired by the mayor with the consent of the council. *Kennedy* v. *Garner*, 230 Ark. 698, 326 S.W.2d 810 (1959). A marshal is compensated in one of two ways, either by fees collected for certain services performed pursuant to Ark. Stat. Ann. § 12-1722 (Supp. 1985) or by a salary from the city council or both. *Conner* v. *Burnett*, 216 Ark. 559, 226 S.W.2d 984 (1950); *City of El Dorado* v. *Faulkner*, 107 Ark. 455, 155 S.W. 516 (1913). If a marshal is not paid a salary, his compensation is the fees authorized by Ark. Stat. Ann. § 12-1711. If the marshal is paid a salary, the city council cannot increase it nor diminish it during his term of office. Ark. Stat. Ann. § 19-907 (Repl. 1980); *City of Berryville* v. *Binam*, 222 Ark. 962, 264 S.W.2d 421 (1954). In *Binam* the city council passed a salary ordinance *after* the marshal was sworn in, and we held it void.

In this case the city marshal was an elected, independent public officer who was authorized to appoint one or more deputies without the approval of the city council. Manley appointed Cotton pursuant to the statute. Ark. Stat. Ann. § 19-1104. That was his exclusive prerogative. However, it was the exclusive responsibility of the city council, the legislative body of the city, to determine whether any salary would be paid. *Czech* v. *Baer*, 283 Ark. 457, 667 S.W.2d 833 (1984). The marshal could not set nor appropriate the salary nor could he be delegated the right to set salaries. *Beaumont* v. *Adkisson*, 267 Ark. 511, 593 S.W.2d 11 (1980).

In *City of El Dorado* v. *Faulkner, supra,* a deputy marshal sued for back pay alleging an ordinance or resolution was passed fixing his salary. He could not produce the ordinance and offered parol testimony. We said:

> The burden was upon the plaintiff to prove the existence of an ordinance obligating the city to pay him a salary as deputy marshal for, in the absence of such an ordinance, he is, under the statute, entitled to 'receive the like fees as sheriffs and constables.'

The case before us is virtually identical. The only difference is Cotton's legal theory. At first he sued for compensation under Ark. Stat. Ann. § 19-1104. That statute does not authorize a salary. Then Cotton amended his complaint alleging that the city marshal was the agent of the city, Cotton was the subagent and as subagent he was entitled to compensation since the city had accepted the "fruits of said agency by collecting and retaining fines and other monies forthcoming from Plaintiff's written citations."

Cotton abandoned any claim for statutory fees in the course of the trial and asked the court to instruct the jury under the theory of agency and implied contract law.

The appellee relies on *Texarkana* v. *Friedell*, 82 Ark. 531, 102 S.W. 374 (1907), for the principle that a city may ratify an agent's unauthorized acts (Manley being the agent who hired Cotton). In *Friedell* the city attorney employed another attorney to help him in a lawsuit. The other attorney, Friedell, told the city attorney, the mayor, and four members of the council he expected

to be paid. We found the city was not liable since the city had not ratified the employment. We said:

> Ratification, if at all, of the employment of appellee was by the city attorney, the mayor and the individual members of the council. This does not meet the requirements of the law, for the ratification must be by the principal or by authorized agents. Neither the mayor nor the city attorney was an authorized agent for the purpose of employing an attorney to assist the city attorney, and their assent or ratification lacks binding effect.

> Knowledge by the individual members of the council, brought home to them by conversation on the street, could not be considered as knowledge of the principal, which is the city itself, represented by the council as its legislative body. It must act as a body, and cannot be bound by individual acts or knowledge brought home to individual members.

Manley was not the legal agent of the city, and the city had no duty to act in any way regarding Cotton's appointment. There is no evidence that the council ever appointed Manley as its agent or legally ratified any of his actions. During one council meeting, one of the aldermen asked Cotton if he would be willing to accept $160 per month. He spurned the offer and that ended the matter. Ratification did not occur. Cotton volunteered his services and the motion for directed verdict should have been granted.

Reversed.

PURTLE and NEWBERN, JJ., dissent.

DAVID NEWBERN, Justice, dissenting. The majority opinion notes that Mr. Cotton's legal theory was one of implied contract, but it does not make a distinction between contract implied in law and contract implied in fact. In my view this matter was submitted to the jury on a theory of contract implied in law or quasi contract. Mr. Cotton's claim is that the city accepted his services with knowledge that they were being provided by him and he should be compensated, not for some salary figure which might have been the subject of an ordinance, but for the value of his services.

It is said that the case of *City of El Dorado* v. *Faulkner*, 107 Ark. 455, 155 S.W. 516 (1913), is "virtually identical" to the one before us now except for the "legal theory" presented by Mr. Cotton. In my view, that difference is substantial. There, the claim was based on an allegation that an ordinance had been passed pursuant to which the claimant was entitled to salary. Here, no such claim is being made, rather the claimant seeks the value of his services, not on the basis of any ordinance or express contract, but because they were provided by him and accepted by the city.

In his opening statement, counsel for Mr. Cotton said the claim was for the value of the services rendered. The majority opinion correctly notes that instructions on agency and ratification were given; however, no mention is made of the court's instruction number 16 which was: "Where labor or material is furnished by a party and no price is agreed upon, the law will imply an agreement to pay what it is worth."

Mr. Cotton was appointed by the marshal, sworn in by the mayor of Greenbrier, and given an official City of Greenbrier identification card showing the oath he had taken to become assistant marshal. He purchased the necessary clothing and went to work. He appeared before numerous sessions of the city council which declined to vote up or down on a salary for him. Unlike *Texarkana* v. *Friedell*, 82 Ark. 531, 102 S.W. 374 (1907), in this case we have no question of ratification resulting from the casual knowledge of various members of the council. Here the matter was presented officially to the council which "tabled" it from time to time, thus effectively stringing Mr. Cotton along all the while having official knowledge of his situation.

In my view, given these facts and the court's instruction 16 permitting a finding of a contract implied in law, the jury's verdict and the judgment based upon it should stand.

PURTLE, J., joins in this dissent.